Frank E. Kopcinski (SBN 297521)
Email: fkopcinski@crla.org
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
1880 Santa Barbara Ave. Suite. 240
San Luis Obispo, CA, 93401
Telephone: (805) 544-7994
Facsimile: (805) 544-3904

[*Additional Counsel listed on following page*]

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Pamela Langley, Renee Askew, Aaron Stinnet, Edward Marquez, Christina Malmen, *individuals;* and Hope's Village of SLO, *a non-profit corporation,*<br><br>　　　　Plaintiffs<br><br>　　　　v.<br><br>City of San Luis Obispo, *a municipality*; and DOES 1 to 10, inclusive,<br><br>　　　　Defendants | COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF<br><br>DEMAND FOR JURY TRIAL |

Lauren Hansen (SBN 268417)
Email: lhansen@pilpca.org
Melissa A. Morris (SBN 233393)
Email: mmorris@pilpca.org
Michael Rawson (SBN 95868)
Email: mrawson@pilpca.org
PUBLIC INTEREST LAW PROJECT
449 15th Street, Suite 301
Oakland, CA 94612
Telephone: (510) 891-9794
Facsimile: (510) 927-2977

Luz Buitrago (SBN 114674)
Email: lbuitrago@crla.org
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
1430 Franklin St. Ste 103
Oakland, CA 94612-3209
Telephone: (510) 267-0762
Facsimile: (510) 267-0763

Babak Naficy (SBN 177709)
Email:  babaknaficy@sbcglobal.net
LAW OFFICES OF BABAK NAFICY
1124 Nipomo St, Ste C
San Luis Obispo, CA 93401-3883
Telephone: (805) 593-0926
Facsimile: (805) 593-0946

Ilene Jacobs (SBN 126812)
Email: ijacobs@crla.org
CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
511 "D" St.
Marysville, CA 95901
Telephone: (530) 742-5191
Facsimile: (530) 742-0421

Plaintiffs, Pamela Langley, Renee Askew, Aaron Stinnet, Edward Marquez, Christina Malmen, and Hope's Village of SLO, by and through their attorneys of record, as and for claims against the above-named defendant, City of San Luis Obispo, allege as follows in this complaint. Jurisdiction is invoked in whole or in part under 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12132, and 42 U.S.C. § 1983 because plaintiffs' claims arise under the laws and Constitution of the United States. This Court has supplemental jurisdiction over related claims arising under the California Constitution and other California laws under 28 U.S.C. § 1367.

## **INTRODUCTION**

1.      The City of San Luis Obispo (the City), like most cities in California, has an unprecedented shortage of affordable housing and shelter that has left many of its residents unhoused[1], forcing them to use tents, RVs, and cars as shelter. Rather than taking sufficient action to ameliorate this crisis, the City has continued to strictly enforce a myriad of City ordinances to prevent unhoused residents from sheltering in the City's open spaces and streets.

---

[1] A note on terminology: this Complaint uses "homeless" to encompass persons who are both "unhoused," that is without a fixed residence, and "unsheltered," that is both unhoused and without physical shelter. The Department of Housing and Urban Development (HUD) defines "literally homeless" as lacking a fixed, regular, and adequate nighttime residence; people who are homeless include people living in public and private places not meant for human habitation, people living in shelters and similar temporary arrangements, and people exiting institutions who were homeless prior to entering the institution.

2.     According to San Luis Obispo County's 2019 Homeless Census and Survey, there were 1,483 homeless individuals residing in the County, an increase of 32% since 2017.  Of those, approximately 1,172—79 percent—were unsheltered. Over a quarter of the County's unsheltered residents live in the City of San Luis Obispo.

3.     The City has failed to ensure that there is available and adequate shelter for unhoused people before enforcing City ordinances that purport to regulate conduct, but which have been employed to criminalize being homeless; the City's enforcement of these ordinances has resulted in criminalization of homelessness within its borders. The City's actions have unlawfully deprived and will continue to deprive hundreds of City residents of a place to rest, sleep, or carry out other life-sustaining activities in the City's open and public places, their only remaining options.

4.     The City of San Luis Obispo has just one year-round shelter, 40 Prado Homeless Services Center (40 Prado,) that is operated by the Community Action Partnership of San Luis Obispo (CAPSLO). 40 Prado can normally shelter only 124 individuals, and its bed capacity was reduced to 70 during the COVID-19 pandemic.

5.     During the most serious global pandemic in a century, the City has embarked on a campaign of driving its unsheltered residents out of town—or at least out of sight— violating their constitutional rights. Instead of heeding the Center for Disease Control and Prevention's (CDC) guidance urging local governments to allow unsheltered people to shelter in place without disrupting encampments, the City has continued to enforce its

municipal codes against the members of its unsheltered community.

6.    The City has a policy and practice of citing, fining, and arresting—as well as threatening to cite, fine, and arrest—unsheltered persons to force them to "move along" from public parks, creeks, sidewalks, open spaces, streets, and parking facilities. It often seizes and destroys the personal possessions that these unhoused and unsheltered individuals need for protection, privacy, and survival.

7.    The City's past and ongoing treatment of unhoused individuals threatened and continues to threaten their health, personal autonomy, financial stability, ability to find and continue employment, and access to services and medical attention.

8.    Unhoused residents of San Luis Obispo, including each of the individual Plaintiffs in this lawsuit, are members of the City of San Luis Obispo community. Many are residents who were born and raised in San Luis Obispo. Some have family roots in the area going back many generations. Many attended schools in San Luis Obispo— including at California Polytechnic State University—or work at jobs in the City. Many have serious disabilities.

9.    Plaintiff Hope's Village of SLO is a local nonprofit dedicated to establishing a sustainable community for unhoused people, as well as to helping unhoused people secure the most basic necessities.  Hope's Village has been impacted by the City's actions and has had to divert critical resources to alleviate the harm that the City has caused in its efforts to criminalize resting outside.

10.    The City's practices and policies impacted and continue to adversely affect all Plaintiffs. Some were cited and excessively fined by the City for living in their vehicles or in open spaces. Others were arrested and prosecuted by the City for simply sleeping outside. Collectively, the City's enforcement of a web of ordinances all but ensures that unsheltered persons are forced out of every zone or category of land within the City. There is simply no place left for the individual Plaintiffs to exist without hiding and without the fear and/or imposition of excessive fines. By punishing individual Plaintiffs and others for their homeless status, the City violates the Eighth Amendment, as well as the California Constitution's prohibition against cruel and unusual punishment.

11.    Similarly, the City violates the Fourth Amendment and the California constitution by seizing and destroying unhoused people's personal property.

12.    The City's policy and practice of forcibly removing unhoused people, including the individuals Plaintiffs, from encampments against CDC guidelines puts them in immediate danger and violates their substantive due process rights under the Fourteenth Amendment

13.    All of these policies and actions have a discriminatory effect on unhoused people with disabilities, many of whom are unable to access the City's scarce shelter resources for disability-related reasons.

14.    Plaintiffs bring this action to stop the Defendant City of San Luis Obispo

from citing, arresting, fining, and removing unsheltered people or their belongings for merely being present in public places or engaging in conduct that is essential to their human existence.

## **JURISDICTION AND VENUE**

15.   The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § 12132, and 42 U.S.C. § 1983 because Plaintiffs' claims arise under the laws and Constitution of the United States.

16.   Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

17.  This Court has supplemental jurisdiction over Plaintiffs' related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiffs' state law claims share all common operative facts with their federal law claims, and the parties are identical. Resolving Plaintiff's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

18.   Venue is proper in the Central District of California because the events and conduct complained of herein all occurred in the City of San Luis Obispo, located in San Luis Obispo County.

# PARTIES

## A. Plaintiffs

19.    Individual Plaintiffs Pamela Langley, Renee Askew, Aaron John Stinnet, Edward Marquez, and Christina Malmen are and were at all relevant times unhoused residents of the City of San Luis Obispo.  All have been subjected to the City's enforcement of its varied codes, policies, and practices that criminalize homelessness, impose excessive fines, discriminate against disabled homeless individuals, and in other ways violate federal and state laws.

20.    Plaintiff Hope's Village of SLO is a non-profit 501(c)(3) corporation whose mission is to work to build a sustainable community village for unhoused Veterans and their families. Hope's Village operates programs to assist unhoused people, including: 1) mobile showers for unhoused persons; 2) temporary shelter at local motels; 3) providing Recreational Vehicles (RVs) and vans to unhoused persons; 4) transportation for family reunification outside of the City; 5) outreach and education to the community on homelessness issues; and 6) providing essential basic supplies to people experiencing homelessness.

## B. Defendant

21.   Defendant City of San Luis Obispo (hereinafter City) is a municipal corporation organized under the laws of the state of California and the San Luis Obispo City Charter, with the capacity to sue and be sued.

22.  Defendant City of San Luis Obispo is a recipient of federal funds, including Community Development Block Grant Funds that it uses to fund the Community Action Partnership of San Luis Obispo (CAPSLO). On March 3, 2020, the San Luis Obispo City Council approved $74,453 of its Community Development Block Grant Funds for the 2020 year to go to CAPSLO for its operation of 40 Prado Homeless Services Center. On March 2, 2021, the San Luis Obispo City Council approved $70,963 of its Community Development Block Grant Funds for the 2021 year to go to CAPSLO for its operation of 40 Prado Homeless Services Center.

23. The City also receives funds from the State of California.

24. The City, its employees, including the City Manager, and its agents participated in the unlawful conduct challenged herein. To the extent they did not personally participate, they authorized, acquiesced, set in motion, or failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and harm suffered or that will be suffered by the Plaintiffs. Their acts constitute policies, practices, and customs of the City.

25.   The San Luis Obispo Parks and Recreations Department and the San Luis Obispo Police Department are departments of the City responsible for the administrative ordinance interpretations, exclusion of unhoused people from parks at night, banning of tents at public parks, and other actions which violated Plaintiffs' constitutional and statutory rights.

# FACTUAL ALLEGATIONS

## A. **The City's Housing Crisis**

26. The City's has a housing affordability crisis that is decades old.

27. Approximately one-third of those employed in the City of San Luis Obispo cannot afford housing in the City.

28. According to the According to the California Housing Partnership, San Luis Obispo County has a shortfall of over 9,000 housing units affordable to extremely low-income households (households whose income is less than 30 percent of the Area Median Income).

29. Lower-income renters often struggle to pay their rent. At least 56% of the City's 11,425 renter households were "cost-burdened" in 2017, meaning they spent more than 30% of their monthly income on housing costs. Eighty-four percent of extremely low-income renters are cost-burdened. Even those with tenant-based housing subsidies like the Section 8 Housing Choice Voucher have a hard time affording the rising rental rates within the City.

30. New housing being built in the City is overwhelmingly out-of-reach for the City's lower-income residents. From 2014 to 2019, the City permitted 1,332 housing units affordable to "above-moderate-income" households (households whose incomes are more than 120 percent of Area Median Income), nearly three times its projected need for above-moderate-income housing. In contrast, it permitted only 166 units of housing

affordable to very low-income households (households whose incomes are less than 50% of area median income), only a fraction of the needed housing for very low-income households. This mismatch, in which housing development in the City favors expensive, market-rate housing over housing that is affordable to low-wage workers and people on public benefits, has deepened an already dire housing and homelessness crisis.

31.  This lack of affordable housing is the primary cause of homelessness in San Luis Obispo. According to San Luis Obispo County's 2019 Homeless Census & Survey, respondents identified inability to afford rent (66%) and not enough income (35%) as the top barriers to obtaining permanent housing.

## B. Homelessness in the City

32. San Luis Obispo County's most recent Homeless Census & Survey, conducted in 2019, identified 482 homeless individuals living within San Luis Obispo. Of those, 326—over two thirds—were unsheltered, meaning that they were sleeping on the street, in tents, in vehicles, or in other places not fit for human habitation.

33. Additionally, a large percentage of homeless individuals within the City are living with disabilities. In 2015, CAPSLO reported that 57% of the individuals served at 40 Prado were persons with disabilities.[2] Of the homeless individuals surveyed in the

---

[2] August 25, 2017, Agreement between the City of San Luis Obispo and the Community Action Partnership of San Luis Obispo County, Inc. For the Operation of the Homeless Shelter (pg.15 Exhibit A Attachment B-Narrative Responses)

2019 Homeless Census & Survey, 31% reported having psychiatric/emotional conditions; 26% reported having Post-Traumatic Stress Disorder; 21% reported having a physical disability; and 41% reported having at least one disabling condition.

34. In contrast, Census data indicate that only 5.5% of the City's residents under age 65 have disabilities.

### C. **The City's Lack of Sufficient Shelter**

35.  As of 2019, the entire County of San Luis Obispo had approximately 300 shelter beds, roughly 20% of the number of unhoused people in the County.

36. The City has only one homeless shelter, 40 Prado, which is run by CAPSLO and serves the entire County. 40 Prado has day services, such as laundry and showers. It also has night services, such as a bed to sleep in. 40 Prado provides meals and toiletries, like soap and toothpaste.

37. At maximum capacity, 40 Prado can house, at most, 124 individuals, or approximately 38% of the 482 homeless individuals (326 unsheltered and 156 sheltered) officially counted in the City 2019. Since the Point-in-Time count is generally regarded as an undercount, the gap between 40 Prado's capacity and the number of homeless individuals in the City is likely far greater. This is especially true now, as there are more unhoused individuals in the City of San Luis Obispo than there were in the beginning of 2019.

38. 40 Prado is a congregate homeless shelter. It is an open dormitory with bunk beds. Residents must share bunk beds. Due to the congregate environment, the shelter is often noisy. The lights at the facility turn off at 11:00 p.m. and turn on again at 5:00 a.m.

39. 40 Prado reduced its capacity to 70 beds from March 2020 to around May 2021 in response to the COVID-19 pandemic.

40. On information and belief, CAPSLO discovered an outbreak of the COVID-19 virus at 40 Prado on or around December 14, 2020, and it did not admit anyone new to the shelter for one to two weeks.

41. On information and belief, there have been approximately 30 positive COVID-19 cases at 40 Prado since the end of July 2021.

42. On information and belief, 40 Prado is currently short-staffed and not operating at full capacity. The shelter is now limiting applicants to priority groups like families, those 65 years and older, victims of domestic violence, and people referred from local hospitals.

43. In addition to not having enough capacity to meet the community need, 40 Prado is not accessible to many people with disabilities. Individuals such as Plaintiffs Renee Askew, and Edward Marquez, who have experienced severe or sustained trauma often have flashbacks, panic attacks, or other mental health symptoms triggered by crowded, loud environments like 40 Prado. Similarly, many individuals who are

homeless have agoraphobia, anxiety, or other mental health impairments that make staying at shelters like 40 Prado extremely difficult for them.

44. 40 Prado has strict rules that function to exclude many members of the City's homeless community. 40 Prado requires participants to present a valid California identification with a current address within San Luis Obispo County, even though many unhoused people face barriers to obtaining and keeping IDs. Individuals must verify that they are not required to register as a sex offender, complete a questionnaire, and sign a contract acknowledging 40 Prado's rules and procedures.

45. Participants staying overnight must leave the shelter from 7:00 a.m. to 8:30 a.m. and again from 2 p.m. to 5 p.m. Participants then must check-in by 6:00 p.m. to secure their bed and cannot leave the shelter premises until morning.

46. People who stay at 40 Prado must also sign up for and complete chores. Chores include tasks such as wiping down appliances and mopping. The chores are mandatory for all participants, and, if a person cannot complete a chore, the shelter ejects the person from the shelter and bans them from returning for a period of time. Upon information and belief, 40 Prado does not accommodate persons with disabilities who are unable to complete chores because of their disabilities.

47. 40 Prado gives priority on beds to individuals who are on a verified self-sufficiency plan such as a verified employment search program. It gives additional priority to participants of programs like 40 Prado's Recuperative Care Program or

individuals immediately fleeing domestic violence. Individuals seeking beds are then accepted in the following order: in-county families, fragile seniors sixty-five years or older who can care for themselves independently, and in-county individuals. 40 Prado is not currently accepting out-of-county residents.

48. 40 Prado offers a limited safe parking program for unsheltered individuals who sleep in their vehicles in its parking lot. The parking lot is also shared with participants who use day and night services, so safe parking availability fluctuates. The program requires that the vehicle occupant possess a current driver's license, vehicle registration, and insurance. It also conditions access on participation in a case management program. The City recently opened an additional safe parking lot at Railroad Square with 20 available parking spots.

49. Taken together, the City's dearth of affordable housing, limited shelter resources, and limited access to these resources create a situation in which many of its poor and disabled residents have no option but to live outdoors in cars, in tents, or sleeping rough.

### D.   Unhoused People Living Outdoors on Public Property

50. The City of San Luis Obispo contains over 2,501 acres of land zoned as Conservation/Open Space, including Laguna Lake Park, the Terrace Hill Open Space, the Bob Jones Trail, and various portions of land that serve as buffers between the City limits

and other areas of town. The City has designated only slightly more land for residential use than it has for open space.

51. The Bob Jones City-to-the-Sea Trail is a public multiuse trail named after Bob Jones, a local environmentalist who worked for the California Department of Fish and Wildlife and served as president of the Land Conservancy for the County of San Luis Obispo.

52. The trail has sections along the San Luis Obispo Creek in the Cities of San Luis Obispo and Avila Beach. The portion of the trail that is in the City of San Luis Obispo stretches between Prado Road and Los Osos Valley Road in a segment approximately two miles long.

53. For many years, dozens of homeless individuals such as Plaintiffs Pamela Langley, Renee Askew, and Aaron Stinnet have made their home in areas next the San Luis Obispo Creek and the Bob Jones Trail. Since the City of San Luis Obispo contains few sites where homeless individuals can rest out of sight, its homeless community finds some refuge and privacy along the Bob Jones Trail.  Others stay in different areas of the City. One area, known as "The Circle", is near the 40 Prado homeless shelter and the Bob Jones trailhead. Another area is an open space three miles south of downtown San Luis Obispo next to the historic Pereira Octagon Barn structure, also known as the "Octagon Barn" camp.

54. At each of these locations, unhoused individuals and families form small camps, stay for as long as they can, but are eventually forced to leave—sometimes via arrest—by police officers and park rangers. This cycle repeats itself again and again, and the City's unsheltered residents find themselves constantly on the move, constantly hiding, and constantly in fear of being arrested.

### E. The City's Relevant Municipal Codes and History of Enforcement

55. The City's systematic enforcement of a constellation of local ordinances effectively makes it a crime for homeless individuals to exist in certain public areas and, thus, punishes them by virtue of their homelessness. These ordinances include the following San Luis Obispo Municipal Code sections:

SLOMC § 10.34.020(A) (prohibition against camping or sleeping overnight in vehicles);

SLOMC § 12.04.020 (encroachment);

SLOMC § 12.20.40(E) (ban on being present in a park after hours);

SLOMC § 12.22.050(B) (prohibition against being present in open spaces overnight or after dark);

SLOMC § 12.22.050(P) (no travelling outside designated trails);

SLOMC § 12.23.030(B) (no staying or camping overnight near a creek or on City land that includes or is adjacent to riparian areas); and

SLOMC § 12.23.030(I) (no travelling outside of designated paths near creeks or on City land that includes or is adjacent to riparian areas).

56. The City punishes violations of these ordinances as an infraction, a misdemeanor, or both.

57. Public records provided by the City pursuant to a Public Records Act requests show that between May 2018 and June 2021, the City issued over 300 criminal and administrative citations punishing people for violating this web of ordinances that criminalize, ban and punish sleeping, lying, sitting, and resting outdoors in public places.

58. Approximately 170 of these citations were for simply being in a City park after hours (SLOMC § 12.20.040E), including 28 citations issued in the first six months of 2021.

59. During this time, the City issued 64 citations for being present in open spaces overnight (SLOMC § 12.22.050B); 63 for traveling outside of designated paths near creeks (SLOMC § 12.23.030I), four for being off trail in an open space area (SLOMC § 12.22.050(P)), and one citation each for camping overnight in a vehicle (SLOMC § 10.34.020A) and camping overnight near a creek (SLOMC § 12.23.030B).

60. A substantial majority of the above citations—a mix of misdemeanors and infractions—were issued to unhoused people.

61. The City also issued 27 citations for "unlawful lodging" (Penal Code § 647(e)) to individuals whom it identified as homeless between May 2018 and May 2020.

62.  The City's enforcement actions have also included a number of recent encampment sweeps, in which the City forcibly displaced unhoused people from public property.

63.  The City conducted two major sweeps of the Bob Jones trail in May 2020 and October 2020 that affected more than 70 people and over 60 campsites. The City conducted these sweeps under the threat of arrest and displaced all of the individual Plaintiffs from their community. Some lost personal belongings. The City conducted these sweeps while the City lacked adequate shelter to accommodate its unhoused population.

64.  In February 2021, the City began increasing enforcement efforts against unhoused individuals at public parks, including at Mitchell Park, a City park near downtown San Luis Obispo. On April 13, 2021, the City Council approved on first reading an ordinance that would explicitly ban the use of tents at public parks; City documents indicate that removing unhoused people from Mitchell Park was a primary purpose of this effort. However, the City Council never held a second reading of the ordinance after receiving a demand letter from Plaintiffs challenging the legality of the ordinance.

65.  In late June 2021, the City issued written notices to unhoused residents staying at "the Circle" area of the Bob Jones Trail. The notices stated they would be subject to arrest if they did not move.

66.  On or about July 8, 2021, the City issued notices to unhoused residents staying along the Bob Jones Trail stating they would be arrested if they did not move.

67.  As a result of receiving the June and July 2021 notices, more than a dozen unhoused residents left their campsites along the Bob Jones Trail.

68.  Also on or about July 8, 2021, the City issued written notices to residents staying at an encampment at the Octagon Barn. These notices also ordered residents to leave under threat of arrest.

69.  On or about July 19, 2021, the City issued written notices to vacate to unhoused persons in an encampment next to the San Luis Obispo Creek, approximately one mile south of downtown San Luis Obispo. The notice indicated that encampment residents would be arrested if they did not leave immediately.

70.  On July 25, 2021, San Luis Obispo Police officers disbanded a camp in the open space near Santa Rosa Park by issuing verbal notices to vacate. On August 19, 2021, the City gave written notices to unhoused residents living in encampments near the Bob Jones Trail by Los Osos Valley Road. The notices indicated they would be arrested if they did not move and cited Municipal Code sections pertaining to public open space.

**F.** **The City Destroys and Fails to Secure the Personal Property of Unhoused Persons**

71.  Although the City has written procedures in place regarding encampment sweeps, the City applies these policies inconsistently and unhoused individuals have lost

property during encampment sweeps.

72.     The City has a document called, "Illegal Camping Abatement Procedures and Protocols." These procedures and protocols require the City to conspicuously post "Notices of Law Violations" that include descriptions of notable items in campsites and identification of the owner, if possible. The City has a template notice of law violation it uses to fulfill this requirement. The template notice states that persons must leave "immediately" with their personal property. The notice also states: "Failure to comply with this order will result in the arrest of your person and the seizure of your property. If you leave, and in so doing, abandon your belongings…the belongings will be removed and discarded. You will be prosecuted for the abandoning of the belongings…the abandoning of the belongings shall establish your intent to give up all rights of ownership of said belongings to the City of San Luis Obispo."

73.     The City's encampment abatement protocols also require park rangers to take a picture of the notice and the campsite. Rangers must visit encampment sites at least one or two days prior to a scheduled clean-up to verify the encampment's status. City staff must also photograph the site before and after the encampment sweep and record information about the cleanup and post the photos in its ArcGIS platform.[3]  According to the policy, every opportunity must be given to the occupant to remove their belongings.

---

[3] ArcGIS is a mapping and data tracking system used by the City in a variety of departments, including to track encampment locations.

74. The protocols require City staff to determine the "practicality of separating and leaving personal belongings and discarding trash and non-personal belongings." They indicate that persons can collect their property in the parking lot at the Corp Yard at 25 Prado Road. Property is categorized as "safe-keeping property" and "found property." The City stores "found" property for 90 days, but stores "safekeeping" property for 60 days. To claim property, a person must make an appointment or provide written authorization for another person to retrieve the property. The owner of the property must prove ownership before they are able to retrieve their belongings.

75. However, the City regularly fails to abide by these written procedures and protocols. The City's regular policy and practice is to direct its agents to  tell people at encampments that any items left at the encampments will be thrown away. It is also customary for the City to take and destroy items left at encampments.

76. The City also regularly throws away or destroys the personal property of unhoused persons who were not able to move their belongings in the time that the City gave them to do so.

77. The City also regularly discards or destroys personal property that is temporarily unattended, including when unhoused people leave their personal property temporarily unattended to help other residents who were also trying to move or tend to life sustaining activities like getting water, food, or working.

78. These practices, not the written "Illegal Camping Abatement Procedures and

Protocols" constitute the City's regular policy and practice.

## G. The City's Treatment of its Unsheltered Population During the COVID-19 Pandemic

79. Unhoused people are disproportionately vulnerable to severe illness and death from COVID-19, including due to age, underlying health conditions, and barriers to accessing medical care.

80. Indoor congregate settings like homeless shelters are places where the disease is disproportionately more likely to spread. Homeless shelters throughout California—including 40 Prado—have experienced outbreaks of COVID-19.

81. In spring of 2020, the CDC issued guidance urging local governments to provide handwashing and other sanitation facilities at homeless encampments, and not to clear encampments unless individual housing options are available. The CDC's guidance specifically recommends that local governments "allow people who are living unsheltered or in encampments to remain where they are," going on to state: "Clearing encampments can cause people to disperse throughout the community and break connections with service providers. This increases the potential for infectious disease spread." Over a year later, the CDC continues to recommend not moving unsheltered people or clearing encampments.

82. Contrary to the CDC's guidance, the City has broken up encampments and conducted sweeps of unhoused individuals and encampments on public property within

the City during the COVID-19 pandemic, including all of the encampment sweeps described above.

83. The City has undertaken these actions in flagrant disregard for the prevailing public health guidance regarding COVID-19 and unsheltered homelessness, and for the risk of COVID-19 transmission and severe illness among the City's unsheltered residents. A September 3, 2020, news article quotes San Luis Obispo City Police Captain Jeff Smith dismissing the CDCs recommendations: "Those are recommendations" and "[t]hey're not laws or anything we're held to or required to do."[4]

84. San Luis Obispo County is now experiencing a surge in COVID-19 cases, due in large part to the presence of the Delta Variant. The San Luis Obispo County Public Health Department reported on September 3, 2021, that the number of COVID-19 hospitalizations in the County is near its all-time high, and the County issued a countywide indoor mask mandate on August 31, 2021.

85. But, despite the current COVID-19 surge, the dangers it poses to individual and public health, and the prevailing public health guidance regarding COVID-19 and unsheltered homelessness, the City continues to clear homeless encampments, scatter their residents, and push the City's unsheltered residents from place to place to place.

---

[4] https://www.newtimesslo.com/sanluisobispo/unsheltered-in-place-san-luis-obispos-housed-population-is-staying-home-during-the-pandemic-but-the-unsheltered -are-being-asked-to-move/Content?oid=10067329

## H. The Ongoing and Irreparable Harm to Plaintiffs

### i.      Pamela Langley

86. Pamela Langley is 57 years old. She is a longtime resident of San Luis Obispo County and went to school at Atascadero High School. She later drove a school bus for the Atascadero Unified School District. She is now retired and living with a disability. She has Post Traumatic Stress Disorder (PTSD) and anxiety.

87.  Ms. Langley has been homeless since 2018, following a separation from her husband.

88. Ms. Langley is currently on CalFresh benefits (also known as Food Stamps) and receives some support from her daughter who lives in San Luis Obispo County. She cannot afford housing in San Luis Obispo or the surrounding area.

89. Ms. Langley is unable to stay at 40 Prado, the City's only shelter, because the loud, crowded environment there exacerbates the symptoms of her disabilities. She stayed at 40 Prado previously, and the loud noises and bright lights during the early morning and late at night at 40 Prado caused her to relive traumatic experiences from her past and made her extremely anxious.

90. Additionally, in January 2020, CAPSLO banned Ms. Langley from sleeping overnight at the shelter. She forgot to do a chore and was banned from sleeping there for three days. She was not offered alternative shelter during this three-day period.

91. After her three-day ban ended, Ms. Langley did not return to 40 Prado due to concerns about her health. During the time Ms. Langley stayed at 40 Prado, she was sick with the flu or a cold and had a cough. She noticed there was little to no air flow at 40 Prado. She has not gotten sick while living outside.

92. During the COVID-19 pandemic, Ms. Langley has been especially concerned about the lack of ventilation and potential for disease spread at 40 Prado.

93. Ms. Langley continues to use 40 Prado's services during the day. She uses their shower services and toiletries.

94. On March 6, 2020, early in the COVID-19 pandemic, the City cited Ms. Langley for sleeping at night along the Bob Jones Trail. The citation, issued by the San Luis Obispo Police Department, listed a misdemeanor violation of San Luis Obispo City Municipal Code 12.22.050(B) and indicated that it was for being in "Open Space After Dark."

95. On Monday May 18, 2020, while Ms. Langley was staying along the Bob Jones Trail, San Luis Obispo City park rangers and police officers came to her campsite around at 7:00 a.m. and forced her to move under the threat of arrest.

96. Ms. Langley moved with other individuals to a site off the Bob Jones Trail. She stayed on that site from May 2020 to mid-August 2020. She later returned to the Bob Jones Trail.

97. The City has criminally prosecuted Ms. Langley for sleeping outside. On August 24, 2020, the City brought a misdemeanor charge against Ms. Langley for violating San Luis Obispo City Municipal Code § 12.22.050(B) (case number 20M-05304), the City's ordinance prohibiting sleeping in open spaces overnight. This charge arose from a separate incident from the March 6, 2020, citation.

98. The City removed Ms. Langley from the Bob Jones Trail for a second time in October 2020.

99. On or about October 8, 2020, the San Luis Obispo City Police Department posted a notice at her campsite entitled, "Notice of Law Violation and Order to Remove Property." The notice stated she would be arrested if she failed to remove her property from the Bob Jones Trail pursuant to San Luis Obispo City Municipal Code § 12.22.050(B) (prohibition against being in open space after dark) and California Penal Code § 602 (trespass).

100.   On October 19, 2020, San Luis Obispo City police officers forced Ms. Langley out of her campsite at the Bob Jones Trail. She could not gather her personal belongings in time, and the City did not store them, and instead destroyed her belongings. These belongings included clothing, food, coolers, and, most significantly, the bicycle the Ms. Langley used as her primary mode of transportation.

101.   The City continued to threaten Ms. Langley with arrest after the October 2020 sweep. On November 10, 2020, San Luis Obispo City Police Officers posted a

notice on Ms. Langley's campsite entitled, "Notice of Law Violation and Order to Remove Property." It stated she would be arrested if she failed to remove her property from the Bob Jones Trail. It indicated it was being given pursuant to San Luis Obispo Municipal Code § 12.22.050(B) (prohibition against being in open space after dark) and California Penal Code § 602 (trespass).

102.    The City has not offered Ms. Langley shelter or housing that is accessible to her. The City has repeatedly forced her to move from public places where she was staying outdoors, failed to offer her shelter other than at 40 Prado, and cited and prosecuted her for camping.

103.    On August 6, 2021, Ms. Langley requested a reasonable accommodation from the City requesting that the City not cite, arrest, or displace her from public property, and that it provide access to housing and shelter services that meet her disability-related needs, as a reasonable accommodation of her disability. The City and Ms. Langley are engaging in an interactive process to determine whether and how the City will reasonably accommodate Ms. Langley.

**ii.    <u>Renee Askew</u>**

104.    Renee Askew is 54 years old. She was born and raised in Paso Robles and is a fifth-generation resident of San Luis Obispo County. She has PTSD, anxiety, severe depression, and arthritis.

105.    The City has repeatedly punished Ms. Askew for living unsheltered in San Luis Obispo, including by citing and charging her for sleeping outdoors in public spaces, and by destroying her personal property during an encampment sweep on the Bob Jones Trail.

106.    Ms. Askew began residing on the Bob Jones Trail on or about November 11, 2019.

107.    On March 6, 2020, the City brought a misdemeanor charge against Ms. Askew for violating City Municipal Code § 12.22.050(B) (prohibiting being in open spaces overnight or after dark).

108. On or about May 18, 2020, police officers from the San Luis Obispo Police Department forced Ms. Askew to move from her home along the Bob Jones Trial under threat of arrest.

109. The forced move was traumatizing to Ms. Askew.

110. When they forced her to move, the police did not give Ms. Askew adequate time to get her personal belongings in order, and she lost many of her possessions, including a nine-person tent and cooking utensils.

111. On or about October 22, 2020, police officers from the San Luis Obispo Police Department again forced Ms. Askew to move from where she was staying along the Bob Jones Trial.

112.  On or about November 5, 2020, a San Luis Obispo City police officer arrested Renee Askew for an outstanding warrant. The underlying charge was for violating Municipal Code §  12.22.050(B) (being in open space after dark).

113.    On January 4, 2021, during the height of the COVID-19 pandemic, the City brought a misdemeanor charge against Ms. Askew for allegedly violating City Municipal Code § 12.23.030(I), the City's ordinance prohibiting traveling outside of designated paths.

114.    Ms. Askew currently has warrants out for her arrest for misdemeanor charges related to living outside. These warrants are for cases 21M-00345 (SLOMC § 12.22.050 [traveling outside designated paths]) and 20M-02241 (SLOMC § 12.22.050(B)-(M) [open space violation]).

115.    In or about November 2019, while living unsheltered in San Luis Obispo, Ms. Askew tried to obtain shelter at 40 Prado, but she was turned away because she could not prove that she had lived in San Luis Obispo County for all of the past year. Ms. Askew was unable to use 40 Prado's services because she had temporarily lived outside of San Luis Obispo County during the preceding year, and 40 Prado refused services to anyone who could not prove that they had lived in the County for a year or more.

116.    Ms. Askew's disabilities also make it difficult—if not impossible—for her to stay in a congregate setting like 40 Prado.

117.    In addition to the personal belongings that were seized by the City during the May 2020 sweep of the Bob Jones trail encampment, Ms. Askew has lost other personal property to the City's enforcement efforts, including nine-person tent and cooking utensils.

118.    Currently, Ms. Askew is living outside under constant fear that she will be arrested  for her outstanding warrant.

119.    On August 6, 2021, Ms. Askew submitted a reasonable accommodation request to the City requesting that the City not cite, arrest, or displace her from public property, and that it provide access to housing and shelter services that meet her disability-related needs.  The City and Ms. Askew are engaging in an interactive process to determine whether and how the City will reasonably accommodate Ms. Askew.

### iii.    **Aaron Stinnet**

120.    Aaron Stinnet is 37 years old. He has been homeless in San Luis Obispo since 2003. Mr. Stinnet has Attention Deficit Disorder, PTSD, anxiety, and depression.

121.    Mr. Stinnet is not able to stay at a congregate shelter because of his disabilities. The group settings and restrictive rules trigger his anxiety and other mental health impairments.

122.    Mr. Stinnet stayed at the now-closed Maxine Lewis Memorial Shelter a few times six or seven years ago but had a difficult time there.

123.     The City has cited and prosecuted Mr. Stinnet multiple times over the years for sleeping outside. On information and belief, from 2012 to 2021, the City has had over 500 documented interactions with him. As a result, he has moved from camp to camp and park to park.

124.     The City has both fined and prosecuted Mr. Stinnet for sleeping outside.

125.     On July 10, 2019, the City brought two misdemeanor charges against Mr. Stinnet for violating Municipal Code § 12.23.030(I) (prohibiting travelling outside of designated paths), but those charges were eventually dismissed.

126.     On February 20, 2020, the San Luis Obispo City Police Department issued Mr. Stinnet a citation for violating Municipal Code § 12.20.040(E), (being present in a park after hours). The City brought a civil assessment against him for this charge in the amount of $861 in fall 2020. On November 3, 2020, the City referred the civil assessment to collections.

127.     Mr. Stinnet has no income or assets and cannot afford to pay these fines.

128.     On February 24, 2020, the City Attorney brought a misdemeanor charge against Mr. Stinnet for violating City Municipal Code § 12.23.030(I) (traveling outside of designated paths).  There is an active warrant out for Mr. Stinnet's arrest on this charge.

129.     Mr. Stinnet currently lives unsheltered on public property in the City but cannot stay in a fixed location due to the ongoing threat of citation and arrest.

130.    On August 6, 2021, Mr. Stinnet requested a reasonable accommodation from the City requesting that the City not cite, arrest, or displace him from public property, and that it provide access to housing and shelter services that meet his disability-related needs, as a reasonable accommodation of his disability. The City and Mr. Stinnet are engaging in an interactive process to determine whether and how the City will reasonably accommodate Mr. Stinnet.

### iv.  Edward Antonio Marquez

131.    Edward Antonio Marquez was born on April 4, 1973, in Monterey Park, California. Mr. Marquez has PTSD, Bipolar Disorder, and Attention Deficit Hyperactivity Disorder.

132.  Mr. Marquez first moved to San Luis Obispo in 1993 when he began attending the California Polytechnic State University of San Luis Obispo (CalPoly). In 1997, Mr. Marquez graduated from CalPoly with a degree in photography and a minor in journalism.

133.  Mr. Marquez has worked at the Los Angeles Times, and has completed multiple art projects involving font design, web page design, and working on a mural project in downtown San Luis Obispo.

134.  Mr. Marquez has lived in multiple places since graduating from CalPoly, including New York and Los Angeles. He moved back to San Luis Obispo in 2014 after his mother died in 2013. His mother's death was very difficult for Mr. Marquez.

135.  Mr. Marquez became homeless in 2017 and has stayed at different places, both within San Luis Obispo and in other parts of San Luis Obispo County.

136.  In late 2019, Mr. Marquez began staying at an encampment near Ontario Road in the City of San Luis Obispo.  Mr. Marquez felt safe at the Octagon Barn and had hoped to shelter in place there during the pandemic. However, the San Luis Obispo Police Department arrested him there in March 2021 for violation of Municipal Code § 12.22.050(P) (traveling outside of designated paths). To the best of his recollection, Mr. Marquez did not receive any advance written notice that he had to vacate his shelter by a given date before the police arrested him.

137.  When police arrested him, Mr. Marquez requested that the City preserve and store his personal property, including his laptop. While Mr. Marquez was under arrest, and before he could return to the Octagon Barn encampment, the San Luis Obispo Ranger Service and San Luis Obispo Police Department removed his shelter and belongings from the encampment. They left a property inventory sheet where Mr. Marquez's shelter and belongings had been removed. But his laptop, as well as several other items, was absent from the list. Nor did the City return these items to him.

138.  On August 6, 2021, Mr. Marquez requested a reasonable accommodation from the City asking that the City not cite, arrest, or displace him from public property, and that it provide access to housing and shelter services that meet his disability-related needs. Mr. Marquez is still unhoused. The City and Mr. Marquez are engaging in an

interactive process to determine whether and how the City will reasonably accommodate Mr. Marquez.

### v.  Christina Malmen

139.    Christina Malmen is 56 years old. She has been homeless since 2003. Ms. Malmen used to be employed. She worked for different companies, including the Hometown Buffet, Taco Bell, and Barnes and Noble.

140.    In 2014 Ms. Malmen was in a car accident. As a result of that accident, she became disabled. The back injuries and compound fractures she experienced from the accident limited her ability to walk, to bend down, and to climb stairs.

141.    Ms. Malmen is currently living in her RV in the City.

142.    The City cited Ms. Malmen for living in her vehicle. On February 27, 2020, in the early days of the COVID-19 pandemic, it issued her a fine in the amount of $130 for violating San Luis Obispo Municipal Code § 10.34.020(A), the City's ordinance prohibiting camping or sleeping overnight in vehicles.

143.    Ms. Malmen cannot afford the fines levied on her by the City for living in her vehicle. Ms. Malmen tries to survive each month on Social Security with an income of $925 per month. She is not able to afford an apartment in the City of San Luis Obispo.

144.    She fears future citations and fines due to living in her vehicle.

### vi.      **Hope's Village of SLO**

145.    Plaintiff Hope's Village of SLO is a non-profit 501(c)(3) corporation whose mission is to work to build a sustainable community village for unhoused Veterans and their families.  Hope's Village brings this action as an organizational Plaintiff.

146.    Hope's Village is dedicated to establishing a safe, healthy, and drug-free village where Veterans and others who are unhoused and have little or no income can live in dignity and in peace, where their voices will be heard, and where they will have hope in their hearts for a brighter future.

147.    In a region where thousands of people lack basic shelter, Hope's Village will be a safe haven where those willing to work on improving their lives can reside in simple private dwellings, utilizing their current skills and developing new ones.

148.    Hope's Village serves hundreds of unhoused and low-income residents in the City of San Luis Obispo and surrounding areas in the County of San Luis Obispo.  It was founded in 2013 by Becky Jorgeson, who is now its Executive Director.  Since then, the organization has been working to establish a safe village for unhoused persons to rest without threat of criminalization by the City.

149.    Hope's Village draws on the experiences of its volunteer staff and board members who have worked with homeless persons for many years; some also have lived experience of being unhoused.

150.    Hope's Village serves unhoused individuals through five programs: Showers of Hope, RVs for Veterans, Room at the Inn, A Road Back Home, and A Step Up.  The organization is a crucial homelessness service provider in San Luis Obispo.

151.    "Showers of Hope" is a mobile shower unit program that provides free showers for unhoused persons in the City.  It operates every Saturday morning, and staff also distribute donated items such as gift cards, clothing, socks, shoes, sleeping bags, tents, tarps, and rain jackets.  Showers of Hope has provided over 4,700 showers to unhoused community members over the past four years.

152.    Hope's Village also provides people with motel lodging through its "Room at the Inn" program.  It provides lodging when unhoused people are discharged from hospitals, when they are ill, or when they need relief from mental health issues such as depression and anxiety, which are often exacerbated by being homeless.

153.    "RVs for Veterans" is a program that provides recreational vehicles to unhoused Veterans and their families.  The organization has given 102 vehicles to individuals and families, and advocates for increased safe parking options in the City.

154.    "A Step Up" is Hope Village's program that provides vans to unhoused persons to allow them to utilize City and County safe parking programs.

155.    The organization also provides transportation costs to unhoused persons through its "A Road Back Home" program.

156.    Hope's Village conducts community outreach and education on homelessness issues.  Staff at the organization routinely give informational presentations to government personnel, other community-based organizations, churches and clubs. Staff also regularly provide input to local government officials and City and County staff. Staff present at City Council and County Board of Supervisors meetings about homelessness.

157.    There are nine dedicated Hope's Village volunteers who canvas the City providing food, water, sleeping bags, tents, tarps and hope to unhoused people in need.

158.    As COVID-19 spread to San Luis Obispo, Hope's Village became concerned about the impact of the pandemic on the City's unhoused residents.  It understood from CDC guidance that there was a concern that individuals living in congregate settings, such as homeless shelters, were at particular risk of spread of the coronavirus and needed to social distance to decrease that risk.  It was concerned about the inability to social distance within the shelter.  It was also concerned about persons living outside unsheltered.  It asked the director of 40 Prado for assistance in moving unhoused people into motels temporarily during the pandemic.  The shelter declined to do so.  As a result, the organization spent its own funds booking motel rooms to ensure the safety of its shelter residents.

159.    During the COVID-19 pandemic, Hope's Village staff have spent numerous hours advocating for the City to move unsheltered residents, including chronically homeless individuals, into non-congregate shelter, even if only temporarily.

160.    Hope's Village has also expended funds to purchase tents, masks, hand sanitizer, and other supplies to protect people who are living on the street from getting and spreading COVID-19.

161.    The City's criminalization of persons experiencing homelessness frustrates Hope's Village's mission to build a sustainable community for unhoused persons.  Any effort by the City to remove unhoused persons or their property from public property in the absence of adequate available shelter likewise frustrates that mission.

162.    Hope's Village has been forced to divert resources that it would otherwise use to further its mission in order to help homeless residents recover life-sustaining items they lost during sweeps. For example, during the October 2020 sweep, Hope's Village brought tents and sleeping bags to unhoused individuals on the trail who had those items seized or destroyed by the City. These expenditures take away resources that the organization would have normally spent on its programs and services, and they prevent the organization from allocating funds toward its long-term goal of building a sustainable village.

## I.   <u>Plaintiffs Attempted to Resolve This Matter Before Litigation</u>

163. Plaintiffs' counsel attempted to work with the City Attorney and City staff to identify solutions to addressing the immediate needs of unsheltered City residents to have sufficient, adequate, and safe housing and shelter during the ongoing housing crisis and the COVID-19 pandemic, and to stop the City from violating the rights of the City's unsheltered residents. These attempts have included written correspondence on May 29, 2020, October 14, 2020, February 11, 2021, and May 3, 2021, as well as telephone calls and Zoom meetings throughout the past year and a half. The parties also participated in mediation on June 25, 2021.

164. The City removed the second reading of its proposed tent ban from the City Council's agenda following Plaintiffs' May 3, 2021, demand challenging the ordinance's legality. It has also entered into the interactive process regarding the individual Plaintiffs' disability-related needs in accessing shelter and other services.

165. However, the systemic violations of unhoused peoples' rights described above persist, and the parties have been unable to resolve their dispute.

**CAUSES OF ACTION**

**<u>FIRST CAUSE OF ACTION</u>**

Violation of Prohibition Against Cruel and Unusual Punishment

Eighth Amendment to the United States Constitution

California Constitution, Article I § 17

[42 U.S.C. §§ 1983; Cal. Const. art. XI, § 12]

All Plaintiffs as to Defendant City of San Luis Obispo

166.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

167.    Both the United States and California Constitutions protect individuals from being subjected to cruel and unusual punishment.

168.    The City's Notice of Law Violations and Orders to Remove Property from areas in the City and enforcement of those notices, along with Defendant's threatened and actual enforcement of the City's anti-camping ordinance and other laws restricting where persons may reside, effectively punish Plaintiffs and other homeless individuals by virtue of their homelessness.

169.    City of San Luis Obispo, Municipal Code §§ 10.34.020(A), 12.04.020, 12.20.40(E), 12.22.050(B), 12.22.050(P), 12.23.030(B), 12.23.030(I), as enforced by the City against unhoused people, make it a crime for homeless individuals to simply exist in certain public areas and thus punish Plaintiffs and other homeless individuals by virtue of their homelessness.

170.    Ms. Langley, Ms. Askew, Mr. Stinnet, Mr. Marquez, and Ms. Malmen along with many of the individuals served by Hope's Village SLO, have faced fines, citations, threat of prosecution/and or have been prosecuted under these ordinances and suffered harm as a result.

171.    The emergency shelter available in the City for the homeless population is insufficient to accommodate all of the unsheltered individuals currently residing in the City of San Luis Obispo.

172.    A large portion of City's homeless population therefore has no choice but to sleep outdoors, in the City's parks, streets, and open space. By criminalizing camping in this manner, the City is preventing its homeless population from carrying out the most basic functions of survival, including sleeping and staying dry and warm while doing so, without breaking the law.

173.    Further, the City's limited number of available shelter beds are not appropriate for or accessible to certain individuals with disabilities, including Plaintiffs Pamela Langley, Renee Askew, Aaron Stinnet, and Edward Marquez, who are unable to stay in a large, crowded shelter due to disability-related mental health symptoms.

174.  The homeless population in the City, including those who were evicted from the different encampments as described above, have no option but to sleep outdoors, significantly increasing the risk of citation, arrest, fines, and prosecution.

175. Individual Plaintiffs and others living unsheltered in San Luis Obispo, including people served by Hope's Village SLO, live under constant and imminent threat of citation, arrest, fines, and prosecution by the City for living outside in public places.

176. The City's continued illegal activities subject the individual plaintiffs and Hope's Village of SLO to irreparable injury for which they have no adequate remedy at

law.  Plaintiffs are therefore entitled to relief as prayed for below.

## SECOND CAUSE OF ACTION

Violation of Freedom from Excessive Fines

Eighth Amendment to the United States Constitution

California Constitution, Article I §  17

[42 U.S.C. §§ 1983; Cal. Const. art. XI, § 12]

Plaintiffs Aaron Stinnet, Christina Malmen, and Hopes Village as to Defendant City of

San Luis Obispo

177.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

178.    The City's policies and practices as alleged violate the Eighth Amendment of the U.S. Constitution and Article I, § 7 of the California Constitution by imposing excessive fines through criminal prosecution of unhoused persons because of them sleeping or resting in public areas.

179.    The City has a policy of prosecuting individuals for resting and sleeping in public areas.

180.    The City enforces Municipal Code §§ 10.34.020(A), 12.04.020, 12.20.40(E), 12.22.050(B), 12.22.050(P), 12.23.030(B), and 12.23.030(I) through criminal prosecution and the imposition of fines.

181.    Individual Plaintiffs are indigent and cannot afford basic necessities. They

cannot afford the fines the City imposes on them and therefore are subjected to further prosecution, loss of confiscated property and increased debt. They have faced criminal prosecution and the imposition of fines for violating one or a number of these ordinances.

182.    The City imposed a $861 fine against Plaintiff Aaron Stinnett for an alleged violation City of San Luis Obispo, Municipal Code § 12.20.040(E) (being present in a park after hours) and then referred that fine to collections.

183.    The City imposed a $130 fine against Plaintiff Christina Malmen for an alleged violation of San Luis Obispo Municipal Code § 10.34.020 (A) (camping or sleeping in a vehicle).

184.    Plaintiff Hope's Village, as a result, expends more of its limited resources to provide advice and assistance to unhoused persons levied with the fines the City imposes on unhoused person by reason of their being unhoused, including Ms. Malmen.

185.    In some instances, the City has sent fines to a collections agency, which can damage Plaintiffs' credit, making it even more difficult for them to obtain stable housing and compounding the amount they will owe.

186.    The named individual Plaintiffs and other unhoused persons acquired these fines by engaging in the involuntary, life-sustaining activity of sleeping in public spaces.

187.    These fines are grossly disproportionate to the underlying offense.

188.    The City's illegal policies and practices continue, subjecting the individual plaintiffs and Hope's Village of SLO to irreparable injury for which they have no

adequate remedy at law.  Plaintiffs are therefore entitled to relief as prayed for below.

## **THIRD CAUSE OF ACTION**

Unreasonable Search and Seizure

Fourth Amendment to the United States Constitution

California Constitution art. 1, § 13

[42 U.S.C. §§ 1983; Cal. Const. art. XI, § 12]

Plaintiffs Pamela Langley, Renee Askew, Edward Marquez, and Hope's Village of

SLO as to Defendant City of San Luis Obispo

189.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

190.  The individual Plaintiffs possess and possessed property that holds both monetary and personal value. Plaintiffs have an expectation to be free from meaningful interference with their property rights, even if their property is stored on public property.

191.  The City's policy and practice is to seize and destroy unhoused people's personal belongings, even if the property poses no threat to public health and does not constitute evidence of a crime.

192.  The City has unlawfully seized and destroyed the personal property of unsheltered City residents, including the personal property of Plaintiffs Pamela Langley, Renee Askew, and Edward Marquez.

193.  The City's seizure and destruction of unhoused people's property has caused

diversion of Hope's Village's resources and frustrated its mission. This seizure and destruction in turn caused Hopes Village to expend more of its limited resources to obtain and provide replacement tents and other supplies to individuals who had lost their necessary survival gear and other belongings due to the City's actions.

194.  Seizure of private property without a warrant or an exception to the warrant requirement constitutes an infringement upon Plaintiffs' Fourth Amendment rights and rights under the California Constitution.

195. Individual Plaintiffs and other unhoused people remain under imminent threat of seizure and destruction of their personal property.

196. The City's illegal policies and practices continue, subjecting individual Plaintiffs and Hope's Village to irreparable injury for which they have no adequate remedy at law.  Plaintiffs are therefore entitled to relief as prayed for below.

## FOURTH CAUSE OF ACTION

State-Created Danger

Fourteenth Amendment to the United States Constitution

California Constitution Article 1, Section 7

[42 U.S.C. § 1983; Cal. Const. art. XI, § 7]

All Plaintiffs as to Defendant City of San Luis Obispo

197.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

198.     Governmental action that affirmatively places a person in a position of danger deprives that person of substantive due process rights guaranteed by the Fourteenth Amendment of the United States Constitution and article XI, § 7 of the California Constitution.

199.     The City has a policy and practice of removing unhoused people from encampments and other public spaces and of seizing and destroying their personal property, such as tents and other survival gear, that is necessary for their protection.

200.     The City engages in these practices without ensuring that individual shelter and/or housing options are available to Plaintiffs and other unhoused individuals.

201.     Without any other available option for shelter and/or seized and destroyed tents and survival gear, homeless individuals are forced to live exposed to the elements, without protection from cold, wind, and rain, jeopardizing their physical and mental health. Plaintiffs with mental health disabilities are likely to suffer aggravated and heightened mental health symptoms and psychological damage. Without protection, the health of homeless individuals with physical disabilities will be jeopardized and their disabilities exacerbated by exposure to the cold, wet, and wind.

202.     The City destroyed the protective camping equipment of Plaintiff Pamela Langley and other homeless individuals when it swept the Bob Jones trail in May 2021, October 2021, and when it swept other encampments, depriving them of the means to

shelter themselves from the elements and secure their belongings without appropriate and accessible alternative shelter.

203.    During the COVID-19 pandemic, the City cleared encampments without ensuring that individual shelter and/or housing options were available to Plaintiffs and other unhoused individuals, contravening the CDC's public health guidance and increasing the risk of COVID-19 disease spread, illness, and potential death.

204.    Additionally, 40 Prado, the City's only emergency shelter, is a congregate shelter that has experienced multiple and recent outbreaks of COVID-19. The City's policies and practices often put unhoused residents in the position of having to choose between going to 40 Prado, where they risk contracting COVID-19, on the one hand, and citation and/or arrest on the other.

205.    The City has refused to stop these unlawful practices despite Plaintiffs' representatives' multiple requests that the City stop engaging in these practices.  On information and belief and based on the City's prior actions, the City will continue to sweep new encampments in contravention of the CDC's guidance.

206.    The City knows and/or should have known that their actions endanger the health and safety of Plaintiffs and other homeless individuals.

207.    The City's policies and practices have and will continue to put individual Plaintiffs and other unhoused people in immediate danger, violating their substantive due process rights under the California and United States Constitutions.

208.   The City's continuing unlawful conduct has frustrated Plaintiff Hope Village's mission and caused it to increase the resources and time expended to assist and serve homeless individuals.

209.   The City's illegal policies and practices continue, subjecting the individual plaintiffs and Hope's Village of SLO to irreparable injury for which they have no adequate remedy at law.  Plaintiffs are therefore entitled to relief as prayed for below.

## FIFTH CAUSE OF ACTION

Discriminatory Effect on Persons with Disabilities

[42 U.S.C. § 12131 *et seq.*]

All Plaintiffs as to Defendant City of San Luis Obispo

210.  Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

211.  Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, prohibits discrimination against people with disabilities by state and local governments and their programs.

212.   Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

213.  The City is a local government covered by Title II of the ADA.

214.  Individual Plaintiffs Pamela Langley, Aaron Stinnet, Renee Askew, Edward Marquez, and Christina Malmen are "qualified persons with disabilities" as defined under the ADA. 42 U.S.C. § 12102; 42 U.S.C. § 12131; 28 C.F.R. § 35.108.

215.  Discrimination under Title II of the ADA includes administration of programs in a way that has a discriminatory effect on people with disabilities, or that has the "effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to individuals with disabilities." 28 C.F.R. § 35.130 (b)(3)(ii).

216.  The City's law enforcement activities, including the citation and prosecution of unhoused individuals for living in tents, in vehicles, and outdoors in public spaces and on public streets, are programs, services, and/or activities covered by Title II of the ADA.

217.  The City's parks and open spaces are programs, services, and/or activities covered by Title II of the ADA.

218.  The City's removal of homeless individuals, their possessions, and homeless encampments from public property are programs, services, and/or activities covered by Title II of the ADA.

219.  The City's services to unhoused individuals and families, including the services the City funds at the 40 Prado shelter, are programs, services, and/or activities covered by Title II of the ADA.

220.  Individual Plaintiffs, unhoused individuals served by Hope's Village SLO,

and a significant proportion of the homeless population of San Luis Obispo County more broadly have physical or mental health disabilities at greater rates than the City of San Luis Obispo's population, generally, including mobility impairments and mental health disabilities.

221.  The City's practice of citing and prosecuting homeless individuals who live outside or in vehicles in the City of San Luis Obispo's public areas has a disparate impact on people with disabilities.

222.  The City's enforcement of its anti-camping and related ordinances more broadly, has had a disparate impact on people with disabilities because these ordinances criminalize the daily activities of homeless people, who are disproportionately people with disabilities.

223.  The encampment sweeps described above, enforcement actions against individual unhoused people, and ongoing sweeps and enforcement actions had and continue to have a disparate impact on people with disabilities and to deny them meaningful access to the City's programs. The people whom the City has forcibly removed from the place where they had been living, deprived of their personal property, and caused to be in fear of imminent citation, arrest, and incarceration are disproportionately people with disabilities compared to the general population of the City.

224.  The discriminatory effect of the City's enforcement of local ordinances in a

way that effectively criminalizes homelessness is exacerbated by inaccessibility of the City's shelter resources. As a congregate setting, 40 Prado is not a safe and accessible environment for many people with PTSD and other mental health disabilities, including Ms. Langley, Mr. Marquez, Ms. Askew, and Mr. Stinnet.

225.  Further, the City's breaking up of homeless encampments contrary to the CDC's guidance regarding COVID-19 and the unsheltered has disproportionately endangered unhoused people with disabilities, including those who have disabilities that increase their risk of serious illness and death if they contract COVID-19.

226.  The discrimination has caused injury to the individual Plaintiffs Pamela Langley, Edward Marquez, Aaron Stinnet, and Renee Askew, and other unhoused persons, as the City's conduct exacerbated symptoms of their disabilities through the trauma of their forced removal from the Bob Jones Trail, Octagon Barn Encampment, public parks, and open spaces.  The discrimination also has caused Hopes Village to expend resources to provide advice and assistance to address and alleviate the injury of unhoused persons, including Ms. Malmen and Ms. Langley.

227.  Forcibly removing residents and closing encampments without first identifying and offering alternative shelter that meets the individualized needs of people with disabilities does not serve any sufficiently compelling or bona fide and legitimate interest of the City, and less discriminatory options are available to the City to achieve any interests it claims it is trying to advance.

228. The City's ongoing discriminatory policies and practices subject the individual Plaintiffs and Hope's Village of SLO to irreparable injury for which they have no adequate remedy at law.  Plaintiffs are therefore entitled to relief as prayed for below.

## SIXTH CAUSE OF ACTION

Discrimination Against People with Disabilities in Federally Assisted Programs

[29 U.S.C. § 794]

All Plaintiffs as to Defendant City of San Luis Obispo

229.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

230.    Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

231.    A "program or activity" includes "a department, agency, special purpose district, or other instrumentality of a State or of a local government" that receives or administers federal funds. 29 U.S.C. § 794 (b)(1)(A).

232.    The City receives and/or administers federal funds, including Community Development Block Grant Funds and, as such, is covered by Section 504.

233.    Individual Plaintiffs are qualified individuals with disabilities under Section

504, as are many of the individuals served by Hopes Village.

234.    Section 504 prohibits covered entities from administering their programs in a way that has a discriminatory effect, or disparate impact, on people with disabilities. *See* 24 C.F.R. § 8.4 (b)(4).

235.    Section 504 requires recipients of federal funds to provide people with disabilities with meaningful access to their programs.

236.    Such discrimination has caused injury to the Plaintiffs.

237. The City's illegal policies and practices continue, subjecting the individual plaintiffs to irreparable injury for which they have no adequate remedy at law.  Plaintiffs are therefore entitled to relief as prayed for below.

## SEVENTH CAUSE OF ACTION

Discrimination on the Basis of Disability by State-Funded Entity

[Cal. Gov't Code § 11135]

All Plaintiffs as to Defendant City of San Luis Obispo

238.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

239.    California Government Code § 11135 states that:

No person in the State of California shall, on the basis of . . . mental disability, physical disability, [or] medical condition . . . be unlawfully denied full

> and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.

Gov't Code § 11135 (a).

240.   The City is a recipient of state funding, and the programs and activities of the City described in this Complaint are administered with the use of state funds.

241.   Section 11135 is intended to prohibit all forms of discrimination prohibited under Title II of the Americans with Disabilities Act and, where possible, to be more protective of people with disabilities. Subsection (b) states:

> With respect to discrimination on the basis of disability, programs and activities subject to subdivision (a) shall meet the protections and prohibitions contained in section 202 of the federal Americans with Disabilities Act of 1990 (42 U.S.C. Sec. 12132), and the federal rules and regulations adopted in implementation thereof, except that if the laws of this state prescribe stronger protections and

prohibitions, the programs and activities subject to subdivision (a) shall be subject to the stronger protections and prohibitions.

242.   Accordingly, all violations of the Title II of the ADA and Section 504 by the City are also violations of section 11135.

243.   Individual Plaintiffs Pamela Langley, Aaron Stinnet, Renee Askew, Edward Marquez, and Christina Malmen are persons with disabilities under section 11135, as are many of the people served by Hopes Village.

244.   Accordingly, by administering its programs in a manner that has a discriminatory effect on people with disabilities, the City has violated, and continues to violate, section 11135.

245.   Such discrimination has caused injury to the Plaintiffs.

246.   The City continues its discriminatory policies and practices, subjecting the individual Plaintiffs to irreparable injury for which they have no adequate remedy at law. Plaintiffs are therefore entitled to relief as prayed for below.

## **EIGHTH CAUSE OF ACTION**

Declaratory Relief

[28 U.S.C. §§ 2201-2202]

All Plaintiffs as to Defendant City of San Luis Obispo

247.    Plaintiffs incorporate each and every allegation of the preceding paragraphs as if fully set forth herein.

248.    Under 28 U.S.C., § 2201, this Court has authority to issue a judgment declaring the rights of the parties and issue an injunction to enforce the Court's declaration.

249.    An actual controversy exists between Plaintiffs and Defendant in that Defendant has engaged and continues to engage in the unlawful and unconstitutional conduct as alleged and intends to continue this unlawful conduct as an ongoing practice and policy of the City of San Luis Obispo.  Plaintiffs therefore seek a declaration of rights with respect to this controversy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief against Defendant as follows:

1.    For a preliminary and permanent injunction, enjoining and restraining Defendant City of San Luis Obispo from violating the United States and California Constitutions' prohibitions against cruel and unusual punishment by citing, arresting, fining, and/or prosecuting unsheltered individuals in public places within the City for alleged violations of laws that punish people for camping, sleeping, staying, or traveling in those places, including alleged violations of:

    a.    § 10.34.020(A) (prohibition against camping or sleeping overnight in vehicles);

b.  § 12.04.020 (encroachment);

c.  § 12.20.40(E) (ban on being present in a park after hours);

d.  § 12.22.050(B) (prohibition against being present in open spaces overnight);

e.  § 12.22.050(P) (no travelling outside designated trails);

f.  § 12.23.030(B) (no staying or camping overnight near a creek);

g.  § 12.23.030(I) (no travelling outside of designated paths near creeks).

2.    For a preliminary and permanent injunction enjoining the City from violating the Eighth Amendment by imposing excessive fines and fees on unhoused people for violations of the above ordinances.

3.    For a preliminary and permanent injunction, enjoining and restraining the City from seizing and disposing of homeless individuals' property in violation of their rights under the United States and California Constitutions.

4.    For a preliminary and permanent injunction, enjoining and restraining the City from removing unhoused people from encampments, and from depriving them of their necessary survival gear, in the absence of adequate, individual shelter or housing, in violation of their right to be free from state-created danger under the United States and California Constitutions.

5.     For a preliminary and permanent injunction, enjoining and restraining the City from acting inconsistently with the CDC's guidance regarding COVID-19 and unsheltered homelessness.

6.     For a preliminary and permanent injunction ordering the City and its agents to cease actions which discriminate against people with disabilities in the administration of their programs and to reasonably modify those programs to avoid any continued discrimination.

7.     For declaratory judgment that Defendant's policies, practices, and conduct as alleged herein violate Plaintiffs' rights under the Eighth Amendment, the Fourth Amendment, the Fourteenth Amendment, analogous provisions of the California Constitution, the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and section 11135 of the California Government Code.

8.     For costs of suit and reasonable attorney's fees as provided by law.

9.     For such other relief as the Court deems just and proper.

Dated: September 17, 2021          CALIFORNIA RURAL LEGAL ASSISTANCE, INC.
                                   THE PUBLIC INTEREST LAW PROJECT
                                   LAW OFFICE OF BABAK NAFICY


                                   By: *Babak Naficy*
                                   _____
                                        BABAK NAFICY
                                        Attorneys for Plaintiffs